**THE URBAN LAW FIRM**
Michael A. Urban, Esq.
Nevada State Bar No. 3875
4270 S. Decatur Blvd., Suite A-9
Las Vegas, Nevada 89103
T: 702.968.8087
F: 702.968.8088
E: murban@theurbanlawfirm.com
*Counsel for IBT Local Union 2118*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ALLEGIANT AIR, LLC | )<br>) |
| Plaintiff, | ) Case No. 2-20-cv-01866-APG-DJA<br>) |
| vs. | )<br>) |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION; AIRLINE PROFESSIONALS ASSOCIATION TEAMSTERS LOCAL UNION NO. 2118, | ) **DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS COUNTERCLAIM AND MOTION TO ENFORCE THE ARBITRATION OPINION AND AWARD**<br>)<br>)<br>)<br>) |
| Defendants/Counterclaimants. | )<br>) |

…

…

…

…

…

…

…

…

…

…

**184960**

**TABLE OF CONTENTS**

| | Page |
|---|---|
| **INTRODUCTION**……………………………………………………………………… | 1 |
| **FACTUAL BACKGROUND**……………………………………………………………. | 1 |
|     A.   Union Proposed Issue…………………………………………………... | 2 |
|     B.   Company Proposed Issues………………………………………………… | 2 |
|     C.   Factual Background – Allegiant…………………………………………... | 4 |
|     D.   The Contract Negotiations and Proposals………………………………… | 5 |
|     E.   The CBA Language…………………………………………………….. | 5 |
|     F.   The Bidding Process……………………………………………………… | 6 |
|     G.   The Arbitration and Opinion…………………………………………… | 11 |
| **ARGUMENT** | |
|     I.   The Board Opinion and Award Should be Upheld and Enforced………… | 11 |
|     II.   The Court Should Enforce the Opinion and Award of the Board………… | 14 |
| **CONCLUSION**……………………………………………………………………… | 15 |

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Steelworkers v. American Manufacturing Co.
    363 U.S. 564 (1960)……………………………………………………………. 11

Steelworkers v. Warrior & Gulf Navigation Co.
    363 U.S. 574 (1960)…………………………………………………………. 11

Steelworkers v. Enterprise Wheel & Car Corp.
    363 U.S. 593 (1960)……………………………………………………………. 11, 12

Union Pac. RR v. Sheehan
    459 U.S. 89 (1978)……………………………………………………………... 12

Union Pacific RR v. Sheehan, supra
    439 U.S. 89, 94 (1978)…………………………………………………………. 12

Southwest Airlines v. Local 555 Transport Workers Union of America
    912 F3d 838, 844 (5th Cir. 2019)…………………………………………………. 12

Continental Airlines Inc. v. Airline Pilots Ass'n Int.
    555 F3d 399, 406 (5th Cir. 2009)…………………………………………………. 12

Diamonds v. Terminal Ry Ala State Docks
    421 F2d 228, 233 (5th Cir. 1970)…………………………………………………. 12

Lions v. Norfolk & W Ry
    163 F3d 466, 470 (7th Cir. 1999)…………………………………………………. 13

Brotherhood of Maintenance of Wy Emps v. 500 Line RR
    266 F3d 907, 911 (8th Cir. 2001)…………………………………………………. 13

Green v. Grand Trunk W. R.R.
    F. App'x 172, 176-177, 2005 U.S. App. Lexis 21 266 (6th Cir. 2005)…………... 13

Johnson v. CXS Transp.
    2009 U.S. App. Lexis 18280 at 3 (7th Cir. 1966)………………………………… 13

Finley Lines v. Norfolk S. Rwy
    31 F3d 943, 947 (8th Cir. 2002)…………………………………………………... 13

Soileau v. Southwest Airlines
    1999 U.S. Dist., Lexis 19439 (N. D. Tex, Dec. 10, 1999) (Interpretation of time
    limits) aff'd 232 F3d 210 (5th Cir. 1999)…………………………………………. 13

Earle v. Netjets Aviation
    262 F. App'x 698, 701-02, 183 LRRM 3079 (6th Cir. 2008)…………………….. 13

Goff v. Dakota, Minn & E.R.R.
    276 F3d 997, 998 (8th Cir. 2002)…………………………………………………. 14

Pokuta v. Trans World Airlines
    191 F3d 834 (7th Cir. 1999)……………………………………………………  14

Henry v. Airline Pilots Ass'n
    759 F2d 870 (11th Cir. 1985)…………………………………………………  14

**STATUTES**

45 U.S.C. § 153, First (p) and (q)……………………………………………………  11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1 Defendants, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION; AIRLINE PROFESSIONALS ASSOCIATION TEAMSTERS LOCAL UNION NO. 2118, do hereby present their Opposition to the Motion for Summary Judgment and Motion to Dismiss by Plaintiff/Counterclaim Defendant, ALLEGIANT AIR, LLC ("Allegiant" or "Company") and in Support of their Counterclaim to Enforce the Opinion and Award ("Opinion") of the System Board of Adjustment in favor of Defendants and Counterclaimants, IBT Local 2118.

**INTRODUCTION**

The present action by Allegiant is a classic case of loser's remorse and refusal to accept the Board of Adjustment ("Board") Opinion rendered against them after five (5) full days of arbitration. In their opening statement to the Board, the Company's own counsel repeatedly stated that the question before the Board is "did the Company violate the CBA." Now that the Board has answered that question and found that the Company <u>did</u> violate the CBA and directed the Company to cease and desist on such actions, the Company seeks to set aside the Board's Opinion claiming it lacked jurisdiction to do so.

Ironically, the Company does not argue that the Board's Opinion finding a violation of the CBA is incorrect, but that the grievances filed by the Union were untimely and that the Board exceeded its jurisdiction and the Company somehow was denied due process by the Board's Opinion.

The most often cited argument for a challenge to a Railway Labor Act ("RLA") Board Opinion is that the Board lacked jurisdiction. Courts have generally rejected such claims and this Court should do so as well. This Court should deny the Company's Motion for Summary Judgment to Set Aside the Board's Opinion and grant the Union's Cross Motion for Enforcement.

**FACTUAL AND PROCEDURAL BACKGROUND**

The factual background and issues presented in the arbitration are not really in dispute. The parties were provided with the opportunity to present their issues and five (5) full days to present testimony and evidence on those issues. The issues presented were as follows:

…

…

…

**184960**

1

**Union Proposed Issue**

Is the Company violating terms of the Collective Bargaining Agreement ("CBA") by not creating initial bid award lines in accordance with seniority and preferences of Pilots in accordance with Sections 15.B through 15.I of the CBA?

**Company Proposed Issues**

Whether the manner in which the Company solves pilot schedules in the bid award process for "must work" days is in violation of Section 15.I.1?  If so, what shall the remedy be?

Whether some or all of the grievances are untimely filed and/or barred by the doctrine of laches?

Whether some or all of the grievances should be denied because they failed to include a statement of facts as required by Section 18.C.2. sufficient to allow the Company to research its allegations?

Whether pilots who failed to avail themselves of the Protest Period in Section 15.B.5 are barred from covering any remedy.[1]

The CBA involved in this arbitration is the first CBA between the Union and the Company.  The negotiations between the Union and the Company took several years to complete.  In doing so, the parties agreed to clear specific language on the Company's obligation to award monthly bid lines to pilots in order of seniority (Section 15.B) and by awarding pilot bid preferences (Section 15.I and 15.H).  The Union and the Company also agreed to specific deadlines after the August 1, 2016, CBA effective date for the Company to comply with the seniority and preferences of pilots in the bidding process (See Jt. Ex. 1, Letter of Agreement, pp. IMPLE-1 to IMPLE-5).  (See Declaration of Michael A. Urban, Ex. 1.)

In negotiating the clear CBA language and deadlines, the Company knew that the Union felt that the Company's existing bidding system with "must work days" violated pilot seniority and preferences. (See Tr. pp. 490, lines 2-17; p. 387 line 25 to p. 388, line 16.)

The Company was well aware of its obligation to comply with pilot seniority and preferences and the CBA deadlines to do so.  It even notified the Union of its concerns over meeting those deadlines (U. Exs. 1 through 7).

---

[1] References to Joint Exhibits will be referred to as "Jt. Ex."; Company exhibits will be referred to as "C. Ex."; Union exhibits will be referred to as "U. Ex."; Transcript references will be referred to as "Tr." followed by the page and the line or lines of reference.  The exhibits and transcripts portions relied upon by Local 2118 on these motions are attached to the Declaration of Michael A. Urban filed herewith.

184960

2

As part of the negotiations and first CBA, the parties agreed to specific language on the negotiation of a new Preferential Bidding System ("PBS System") that would comply with the seniority and preference language in the final CBA and allow the parties to transition from the Company's prior bidding system to a new PBS System that the parties would negotiate. (Section 15.A.9 and PBS LOA) (See testimony of Andrew Robles.  Tr. p. 86 and 203-204.)

Because of this language, the Union did not file any specific grievances on the continuing violation of seniority and preferences under the language in the CBA (Tr. p. 75, lines 11-25 to p. 77, line 25; pp 87-90; pp 509-512; U. Exs. 8-11, 12 and 27) and the Company believed that it was able to continue to operate as it had prior to the CBA until a new PBS LOA was negotiated.  (See testimony of Trent Porter, Tr. pp. 377-384.)

All parties agreed that the negotiations for a new PBS System and Letter of Agreement ("LOA"), as contemplated by the CBA language, despite several extensions of time, were formally terminated after the first grievances were filed by the Union and formally in writing in June and July 2018 (Tr. p. 86 and 203-204; U. Exs. 8, 9, 10 and 11.)

Following the Union's formal termination of the PBS negotiations and discussions of an LOA, the Union continued to file grievances on the alleged continuing seniority and preferences violations of the CBA with each monthly pilot bidding for flight schedules (See Declaration of Michael A. Urban) (Tr. p. 75, lines 11-25 to p. 77, line 25; pp 87-90; pp 509-512; U. Exs. 8-11, 12 and Co. Ex. 27.)

The Union did not in fact file any grievances on the violations of the CBA with regard to seniority and preferences until March 2018 when it was apparent that the negotiations for a new PBS System and LOA were not going to result in a new PBS System that complied with the agreed CBA language.

These continued grievances were filed at the request of the Company's counsel, and the Union and the Company agreed that the grievances could be combined for presentation together to an agreed System Board of Adjustment with neutral arbitrator, Richard Bloch (See U. Ex. 12; Co. Ex. 27; Tr pp 86-92; 195; 509-512.)

…

184960

3

**Factual Background – Allegiant**

Allegiant began operations as an airline in 1998 with a business model as an ultra low cost carrier to move passengers from small and medium size cities to larger leisure destinations (Tr. pp. 212-214). Since that time, it has grown from 350 pilots to over 850 pilots, 21 bases, and travels to over 400 destinations (Tr. p. 404, line 24 to p. 405, line 8). It has become one of the most profitable airlines in the United States. When Allegiant started it did not normally fly on Tuesdays and Saturdays, but that model has since changed and Allegiant is flying virtually every day (Tr. pp. 256-257).

Prior to the certification of the Union as the bargaining representative of Allegiant pilots in 2012 the Company used Line Bidding to assign pilots their monthly schedules and assignments (Tr. p. 215, lines 9-18). Line bidding means entire schedules for a month are pre-established and pilots bid for one of these complete monthly schedules (Tr. p. 215, lines 9-18). Line bidding continues to be used by other airlines in compliance with FAA requirements (Tr. p. 78, lines 6-24).

In 2014, Allegiant unilaterally decided to change its scheduling system for pilots. First, it introduced a "Merlot" PBS system, but shortly thereafter this scheduling system was replaced by a Company Crew Bidding Interface ("CBI") system that was further revised in 2017 (Tr. p. 215, lines 22-25 to p. 216, lines 1-10; p. 219, lines 2-11; Tr. p. 354, lines 21-25 to p. 355, lines 1-19; U. Exs. 29-30); (C. Ex. 12).

The Company unilateral changes to their scheduling systems during contract negotiations with the Union did result in extensive federal court litigation between the parties, but none of this litigation changed the language in the final CBA entered into by the parties and effective August 1, 2016 (See U. Exs. 31-41 and C. Exs. 1, 2 and 27; Tr. pp. 253-277).

This litigation did clearly provide notice to the Company that the Union believed that the Company "must work days" in their pre CBA bidding system violated seniority and preferences of pilots (Tr. pp. 521-525; U. Ex. 43A).

Negotiations for the present CBA started in December 2012, and concluded in June 2016, with an effective date for the first CBA between the Union and Allegiant of August 1, 2016 (Tr. p. 364, lines 4-7; p. 318, lines 2-9; C. Ex. 11).

### The Contract Negotiations and Proposals

During the course of the three and one half (3 ½) years of contract negotiations for the current CBA, the Union and the Company passed many different proposals. As a result of the protracted litigation and the discussions during negotiations, the Company was well aware of the Union's objections to "must work days" in the Company's scheduling system and solver and that the Union believed "must work days" violated pilot seniority and preferences (Tr. pp. 521-525; pp. 462-466; pp. 491-492; Union 43A).

Notwithstanding these facts and the Union's requests that "must work days" be removed from the Company's solver and scheduling system (Tr. pp. 462-466; pp. 491-492; pp. 521-52), the Company never passed a single proposal to include "must work days" in the CBA. In fact, the Company agreed to specific language and specific deadlines for initial bid lines to be done in seniority order honoring pilot preferences (Jt. Ex. 1, Sections 15B, 15H, 15I and pp. IMPLE-1 to IMPLE-5).

As part of the CBA, the Union and the Company also entered into an agreement to work cooperatively through a PBS Committee to try to select a Preferential Bidding System ("PBS") vendor, which included consideration of the current in house solution (Jt. Ex. 1, Letter of Agreement Regarding Scheduling Automation pp. SCHSYS 1-2). To attempt to accomplish this the parties included in the CBA language an obligation for the parties to attempt to negotiate an automated PBS Awarding System Implementation Side Letter of Agreement ("LOA") (Jt. Ex. 1, Section 15A9). This section of the CBA included additional time up to one hundred and eighty (180) days to accomplish this task (*Ibid*). However, even with many extensions of time, no PBS vendor was ever selected and no new system was put in place to comply with the CBA. These extended negotiations were terminated in June and July of 2018 (U. Exs. 8, 9, 10 and 11) and the Union's efforts to enforce the CBA through grievances for compliance with Section 15 followed that termination of negotiations.

### The CBA Language

After several years of negotiations, the Union and the Company finally agreed to specific contract language covering applicable definitions (Section 2), compensation (Section 3), seniority (Section 17) and the scheduling and bidding process (Section 15). It was this latter section of the CBA that resulted in the PBS grievances filed by the Union.

**184960**

5

**The Bidding Process**

Section 15 of the CBA provides the process for pilots to bid for Regular, Reserve and Composite Lines of flying and Duty (Jt. Ex. 1, Sections 15 B-J). After the initial bids for Regular and Reserve Lines are created, there is a Schedule Adjustment Period ("SAP") (Jt. Ex. 1, Section 15 K) where pilot schedules may be modified and Composite Lines are constructed. Section 15 of the CBA also provides details for Additional Duty Days (ADD days) (Section 15L), ROE Days (Section 15M), Reassignment Rules (Section 15N), Junior Assignments (Section 15P), the Open Time Award System (Section 15Q), Restrictions on Open time and Trip Trades (Section 15R), Trip Drops (Section 15S), Trip Trades (Section 15T), Open Time Assignments (Section 15U) and Voluntary Flying Notification (VFN) (Section 15V). (Jt. Ex. 1, pp. 15-12 to 15-21).

The primary portions of Section 15 applicable to the arbitration are Sections 15B through 15I and more particularly the following portions of those Sections:

**B.    Monthly Bid Period Timeline.**

1. A Monthly Bid shall be conducted during each Month of a calendar year. Each Bid Month's duration shall be the number of Days in each respective Month, with the exception of January, February and March which each will be considered a 30 day month through adding Jan 31 and Mar 1 to February. Leap year will make February a 31 day month.

2. <u>Bid Lines shall be awarded to current and qualified Pilots in order of Seniority</u>. (Emphasis added.)

**C**.    **Regular, Reserve and Composite Bid Line Construction**

All Initial Bid Lines shall be constructed in accordance with the following rules:

1. All available known Flying at the time of the start of the Monthly Bid Period shall be published and available to be utilized in construction of Regular and Reserve Bid Lines, available for SAP, and Composite Bid Line Construction. Any Duty remaining uncovered after the Monthly Bid Period shall be left in Open Time and awarded or assigned throughout the Bid Month, in accordance with this Section 15. Available known flying is defined as committed and known flight or reserve pairings at the time of publishing.

2. Unless otherwise specified by the Pilot in his Bid Preferences, as provided in Section 15 an involuntarily TDY'd Pilot's Bid Line shall contain a minimum of one (1) block of four (4) consecutive Days Off in any Bid Month.

**E.** **Scheduling Systems**

1. In accordance with this Section 15, the approved PBS and Open Time Bidding and Awarding Software Systems, along with other complimentary software systems as required, shall be the means for Pilots to conduct the following functions:

    a. Trip Pairing construction.

    b. Regular and Reserve Line construction.

    c. Initial Bidding and Bid Awards for Regular, Composite and Reserve Bid Lines, utilizing Pilot Bid Preferences.

    d. Composite Bid Line construction.

    e. Schedule Adjustment Period Bidding (SAP).

    f. Trades with another Pilot.

    g. Trades with Open Time.

    h. Open Time pickups.

    i. Vacation Bids, Awards, slides and trades.

    j. Trip Drops.

    k. Bidding for Training.

    l. Voluntary Flying Notification requests and awards.

**F.** **Published Information in the Monthly Bid Period**

1. The Initial Monthly Bid Period information for a PBS Bid shall be made available through the Company's approved PBS software system, to all Pilots, in accordance with subsection 15.B., Monthly Bid Period Timeline. The following scheduling information shall be electronically available to all Pilots in PBS:

    a. Number of eligible bidding Pilots, per Position and Domicile.

    b. Bid Line PCH construction range.

c. Projected number of Regular Lines.

d. Projected number of Reserve Lines.

e. Projected number of Composite Lines.

f. All Trip Pairing information listed below:

    i. Report and release times;

    ii. Pairing number.

    iii. Flight number.

    iv. Block and Credit Time of each Segment.

    v. Block and Credit Time of the Pairing.

    vi. Duty Time.

    vii. Ground time at stations.

    viii. Deadhead time

    ix. Originating, intermediate and terminating stations

    x. RON information, including hotel information as available, ground transportation as available, etc.

    xi. Time Away from Base (TAFB).

    xii. Fleet Type (e.g., MD80, B757, A320).

g. All incoming Transition Duty from the current Bid Month into the new Bid Month.

h. All known absences for the upcoming Bid Month.

i. The projected average Initial Bid Line PCH for the new Bid Month, based on known Trip Pairings, RAPs and all Pilots' scheduled absences at the time of the start of the Monthly Bid Period.

j. A list of Pilots eligible to Bid in each Domicile.

k. Names of the Instructors and Check Airmen to be utilized on a Full Time Training Line during the Bid Month.

    **G.**    **PBS Bid Line Construction**

**184960**

1. <u>The PBS initial construction run shall build Bid Lines utilizing Pilot Preferences and in accordance with subsection 15.C., Bid Line construction parameters and award Bid Lines to all eligible Pilots in accordance with subsection 15.I., PBS initial Awards.</u> All Bid Lines shall be constructed to a maximum PCH of ninety-five (95) plus a single additional pairing, if requested. (Emphasis added.)

**H.     Pilot Bid Preferences**

Bid Preferences in the Initial Bid shall include:

    1. Bid Line with maximum or minimum Days Off.

    2. Bid Line with maximum or minimum PCH value.

    3. Specific Days Off.

    4. Standing Bid.

    5. Specific Trip Pairings.

    6. Maximum or minimum Trip Pairing PCH. Pilot may specify different requests for Individual Days.

    7. AM or PM "Duty On" times for daily and/or weekly Duty sequences. A Pilot may request different "Duty On" times for specific Days in the Bid Month.

    8. Bid Line preferences for blocks of Long Call Reserve (RLC), Short Call Reserve (RSC), or both in the Bid Month.

**I.     PBS Initial Awards.**

1. <u>All Initial Bid Awards shall be accomplished in Seniority order by awarding each eligible Pilot his Bid preferences in accordance with subsection 15.B., Bid Period Timeline</u>. (Emphasis added.)

2. A Pilot who fails to bid in a Monthly Bid Period shall be awarded a Bid Line based upon his Bid preferences (a Pilots Bid Line parameters preferences), which shall be kept on file in his Standing Bid. In the event a Pilot wishes to change his Bid Preferences in his Standing Bid, he shall be required to do so prior to 2359 Pacific Time on the date bidding closes for the Bid Month per the table in subsection 15.B. for his new preferences to apply in the event he fails to Bid.

184960

9

      3. Captains or First Officers with less than one hundred (100) hours in Equipment Type who do not have sufficient Seniority to hold a Regular Line shall be awarded the highest block time Composite Line.

         a. If the Pilot is projected to complete his One Hundred (100) hour requirement prior to the beginning of the 3rd Bid Month, he shall bid in accordance to his Seniority.

      4. Reserve Bid Line Awards

         a. The number of RAPs in a Bid Month shall be based on, but not limited to, the daily operational requirements of each individual Domicile, scheduled Vacation and Training, historical Sick Leave, Military Leave, scheduled Jury Duty and additional scheduled Leaves of Absence.

         b. Reserve Bid Lines shall be awarded in accordance with a Pilots Bid Preferences, pursuant to subsection 14.H.

      5. A Pilot (Regular, Composite or Reserve) unavailable for Duty as a result of scheduled Vacation, Military Duty, or scheduled Leaves of Absence, shall have his Minimum Days Off prorated during the PBS Initial Bid Award based on the table below provided in Section 14.

The Company acknowledged in the CBA and through its testimony and the exhibits presented at the arbitration that it was obligated to comply with these Sections (Tr. p. 490, lines 2-17; p. 387, lines 25 to p. 388, line 16; U. Exs. 1 through 7; 43 and 43A).

The Company also acknowledged that "must work days" were not defined, mentioned or indicated anywhere in the CBA (Tr. p. 489, lines 24-25 to p. 490, line 1) and that it knew the Union and Pilots were opposed to "must work days" as a violation of Pilot seniority and preferences under the CBA (Tr. pp. 521-525; U. Exs. 25, 27, 28, 43, 43A, 44 and 45).

…

…

**The Arbitration and Opinion**

The Company in its motion alleges that the Union did not present any evidence on the Company's claim of untimely filed grievances. However, this allegation is not accurate.

The Union presented testimony and exhibits on the parties' agreement and LOA agreement to discuss a new PBS System and the extensions of those discussions until they were terminated and the Union grievances were filed starting in March 2018. (Tr. p. 489, lines 24-25 to p. 490, line 1; U. Exs. 8, 9, 10 and 11.)

The Company's own witness testified that the Company believed it could continue its prior practices until those PBS LOA negotiations were completed. (See Trent Porter testimony, Tr. pp. 377-384.) The Union also presented evidence of the parties' agreement to include and group all of the PBS grievances for presentation to the Board. (See U. Ex. 12; Co. Ex. 27; Tr. pp 86-92, 195, 509-512.)

The majority of the Board did consider the Company's claim of untimely filed grievances and did consider and interpret the language in the CBA, including Sections 15, 18 and 19 and the complete contract, including the parties' agreement on the new PBS System and the PBS LOA and the testimony at the arbitration. (See Opinion, pp. 3, 7-11 and 27-30.) Based on this review and interpretation of the CBA, the Board found the Union grievances to be timely and found the Company to have violated the seniority and preferences for pilots provided for in the CBA. Nothing in the Board's Opinion changed the express written language in the CBA.

**ARGUMENT**

**The Board Opinion and Award Should be Upheld and Enforced**

Section 3, First (p) and (q) of the RLA provide for federal courts to both enforce or set aside an arbitration award in whole or in part (45 U.S.C. § 153, First (p) and (q)).

The U.S. Supreme Court in decisions dating back to the Steelworkers Trilogy have repeatedly stated that Congress intended disputes over the interpretation or application of CBAs to be resolved through arbitration rather than by the courts. Steelworkers v. American Manufacturing Co., 363 U.S. 564 (1960); Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); and Steelworkers v.

184960

11

Enterprise Wheel & Car Corp., 363 U.S. 593 (1960).  This deference to arbitration applies equally to cases under the RLA Union Pac. RR v. Sheehan, 459 U.S. 89 (1978).

Counsel for the Company has correctly set forth the standards for a federal court to set aside an arbitration award.  Those standards are as follows:

1. The arbitrator failed to comply with the requirements of the RLA.
2. The arbitrator failed to confine himself within the scope of his jurisdiction.
3. The arbitrator exhibited evidence of fraud or corruption.

(See Plaintiff's Motion for Summary Judgment and Motion to Dismiss Counterclaim at p. 16 ("MSJ")).

The Company has alleged that the Board in this case exceeded its jurisdiction (MSJ pp. 17-25) and that the Board's Opinion and Award has somehow violated the Company's Right to Due Process (MSJ pp. 25-27).

The scope of judicial review of arbitration awards under RLA has been correctly characterized as being "among the narrowest known to the law."  See Union Pacific RR v. Sheehan, supra, 439 U.S. 89, 94 (1978).  Counsel for the Company correctly makes reference to these narrow standards and the federal court decision in Southwest Airlines v. Local 555 Transport Workers Union of America, 912 F3d 838, 844 (5th Cir. 2019).  The Court there specifically stated, "Rather than endeavoring to interpret the parties CBA for itself, the court is mindful of the narrow scope of its review.  So long as the arbitrator's decision draws its essence from the contract in question and does not ignore the CBA's plain language in a manner that reflects a personal brand of industrial justice, the court must defer to the arbitrator.  See Continental Airlines Inc. v. Airline Pilots Ass'n Int., 555 F3d 399, 406 (5th Cir. 2009)" Ibid.

Courts have generally rejected claims that a Board failed to act within its jurisdiction as attempts to have a court substitute its own interpretation for those of the Board.  See Diamonds v. Terminal Ry Ala State Docks, 421 F2d 228, 233 (5th Cir. 1970).  In doing so, courts have held that as long as the Board is "even arguably construing or applying" the collective bargaining agreement, it is acting within the scope of its jurisdiction.

"The question for a federal court asked to set aside an arbitration award…is not whether the arbitrator(s) erred in interpreting the contract; it is not whether they clearly erred in interpreting the

184960

contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. If they did, their interpretation is conclusive." <u>Lions v. Norfolk & W Ry</u>, 163 F3d 466, 470 (7th Cir. 1999).

The Eighth Circuit Court of Appeals has held that even when there are ambiguities in an award that suggest a Board may have exceeded its authority, a court is "obligated to grant the Board's decision the benefit of the doubt and conclude that jurisdiction was properly exercised." <u>Brotherhood of Maintenance of Wy Emps v. 500 Line RR</u>, 266 F3d 907, 911 (8th Cir. 2001).

Claims that a Board has exceeded its jurisdiction have been rejected where it has been alleged that a Board:

1. Misinterpreted the collective bargaining agreement, <u>Green v. Grand Trunk W. R.R.</u>, 155 F. App'x 172, 176-177, 2005 U.S. App. Lexis 21 266 (6th Cir. 2005). ("Only if no way supported by CBA").
2. Misconstrued procedural requirements of the agreement. <u>Johnson v. CXS Transp</u>., 2009 U.S. App. Lexis 18280 at 3 (7th Cir. 1966) (Timeliness of filing charges.)
3. Relied on insufficient evidence or ignored evidence. <u>Finley Lines v. Norfolk S. Rwy</u>, 31 F3d 943, 947 (8th Cir. 2002). <u>See</u> also, <u>Soileau v. Southwest Airlines</u>, 1999 U.S. Dist., Lexis 19439 (N. D. Tex, Dec. 10, 1999) (Interpretation of time limits) <u>aff'd</u> 232 F3d 210 (5th Cir. 1999)
4. Looked beyond the express language of collective bargaining agreement. <u>Earle v. Netjets Aviation</u>, 262 F. App'x 698, 701-02, 183 LRRM 3079 (6th Cir. 2008)

In this particular case, the Board knew that the Company was asserting that the Union grievances were untimely. Both parties over five (5) days of arbitration, were given every opportunity to present evidence on this issue and they did. In presenting its Motion for Summary Judgment to Set Aside the Board Opinion, the Company has included eleven (11) Arbitration Decisions by other Boards (<u>See</u> Exs. 12-22 to Declaration of Dustin Call in Support of Motion for Summary Judgment.) Apparently, these decisions are to show this Court what other arbitrations and Boards have done and to ask this Court to open the record by this Board to evaluate the evidence and Opinion and make its own interpretation.

However, as stated previously, this Court is not entitled to do so. None of the attached arbitration awards involve this CBA or these parties and they are of no effect on what the Court's limited review is here.

The Board here has reviewed and interpreted the CBA and the evidence presented and made its determination based on that review and its decision should not be disturbed.

In making its Opinion, Arbitrator Bloch and the majority of the Board considered the language in the CBA, including Sections 15, 18 and 19 of the CBA and the Board made its decision on the timeliness of the grievances based on the interpretation of the CBA and the evidence and testimony presented. (See Board Opinion at pp. 3, 7-11 and 27-30). There is no factual or legal basis for this Court to determine that the Board exceeded its jurisdiction and this Court has no authority to replace the Opinion with its own interpretation of the evidence and CBA for that of the Board.

In addition, Courts have held that failure to raise a due process objection before the Board precludes a party from revisiting it later in a court action. Goff v. Dakota, Minn & E.R.R., 276 F3d 997, 998 (8th Cir. 2002). The Company asserted no due process violation arguments before the Board in this case and had every opportunity to present evidence on the issues at arbitration and its post-hearing brief, but did not do so.

**The Court Should Enforce the Opinion and Award of the Board**

As stated previously, Section 3 First (p) authorizes federal courts to enforce Board of Adjustment Opinion and Awards. Under the RLA, a Board's findings and order are conclusive on the parties and subject to enforcement by a court of competent jurisdiction. Pokuta v. Trans World Airlines, 191 F3d 834 (7th Cir. 1999); Henry v. Airline Pilots Ass'n, 759 F2d 870 (11th Cir. 1985).

The Award by the Board in this case is very clear and concise. It provides as follows:

**AWARD**

The grievance must be sustained as set forth below:

Seniority must be observed in solving for Must Work Days. In that process,

expressed bid preferences must be awarded, seniority permitting, in sequential

order. The Company is ordered to cease and desist from practices that interfere

with those requirements.

184960

14

Make-whole remedies shall apply to claims violations occurring after the filing date of the Union's grievance.

By its counterclaim in this action, Local 2118 is seeking enforcement of the Board's Opinion and Award. Local 2118 is <u>not</u> asking for the Court to interpret or review the CBA or the Opinion and Award, but merely to enforce it as allowed by the RLA Act Section 3, First (p). Counsel for the Company in its motion (MSJ pp. 33-35) is apparently attempting to argue that Local 2118 is asking for something other than enforcement by this to reclassify Local 2118's request for enforcement into a "minor dispute" under the RLA for which this Court has no jurisdiction. (<u>Ibid</u>.)

The Board Opinion and Award is very clear.

1. The grievance is sustained.
2. Seniority must be observed in solving Must Work Days. In that process expressed bid preferences must be awarded, seniority permitting, in sequential order. The Company is ordered to cease and desist from practices that interfere with those requirements.
3. Make whole remedies shall apply to claims violations after the filing date of the Union's grievance (Award, p. 31).

It is these Award terms Local 2118 is seeking to have enforced.

## CONCLUSION

The Opinion and Award of the Board is based solely on an interpretation of the CBA and the documentary and oral testimony evidence presented at the arbitration. The Company has failed to establish any legal basis for this Court to substitute its review and judgment of the merits of the case or the Opinion and Award of the Board of that the Board lacked jurisdiction or violated the Company's due process rights.

Dated this 30th day of April, 2021                             **THE URBAN LAW FIRM**

*/s/ Michael A. Urban*
Michael A. Urban, Esq.
*Counsel for Defendants*

**184960**

15

# CERTIFICATE OF SERVICE

The undersigned certifies that on this 30th day of April, 2021, a true and correct copy of the foregoing **DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS COUNTERCLAIM AND MOTION TO ENFORCE THE ARBITRATION OPINION AND AWARD** was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following addresses:

Deverie J. Christensen, Esq.
Joshua A. Sliker, Esq.
Jackson Lewis, P.C.
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101

Doug W. Hall, Esq.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

Aaron S. Markel, Esq.
Jones Day
150 W. Jefferson Ave., Suite 2100
Detroit, Michigan 48226

/s/ April Denni
An Employee of The Urban Law Firm

**184960**    16