# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ALLEGIANT AIR, LLC, | Case No.: 2:20-cv-01866-APG-DJA |
| Plaintiff | **Order Denying Plaintiff's Motion for Summary Judgment, Denying Plaintiff's Motion to Dismiss Counterclaim, and Granting Defendants' Motion to Enforce Arbitration Award** |
| v. | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION, and AIRLINE PROFESSIONALS ASSOCIATION TEAMSTERS LOCAL UNION NO. 2118, | [ECF Nos. 21, 22, 25] |
| Defendants | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION, and AIRLINE PROFESSIONALS ASSOCIATION TEAMSTERS LOCAL UNION NO. 2118, | |
| Counterclaimants, | |
| v. | |
| ALLEGIANT AIR, LLC, | |
| Counterdefendant. | |

Defendants International Brotherhood of Teamsters, Airline Division, and Airline Professionals Associate Teamsters Local Union No. 2118 (together, the Union) represent the pilots employed by plaintiff Allegiant Air, LLC. The parties participated in an arbitration before a System Board of Adjustment (SBA) regarding a dispute over Allegiant's pilot scheduling processes. The SBA granted an award (the Award) in favor of the Union. Allegiant sued to vacate the Award and the Union countersued to enforce it. Allegiant now moves for summary judgment on its claim to vacate the Award and moves to dismiss the Union's counterclaim, while

1    the Union moves to enforce the Award.  Because the SBA did not exceed its jurisdiction and the

2    Award draws its essence from the parties' collective bargaining agreement (CBA), I deny

3    Allegiant's motion for summary judgment to vacate the Award, deny Allegiant's motion to

4    dismiss the Union's counterclaim, and grant the Union's motion to enforce the Award.

5    **I. BACKGROUND**

6         Defendant International Brotherhood of Teamsters, Airline Division represents the pilots

7    employed by Allegiant, an air carrier, for collective bargaining purposes. ECF Nos. 1 at ¶ 3, 4;

8    12 at ¶ 3, 4.  Defendant Airline Professionals Association Teamsters Local Union No. 2118 is the

9    local union responsible for day-to-day representation of the pilots. ECF Nos. 1 at ¶ 5; 12 at ¶ 5.

10        In January 2014, Allegiant began using a preferential bidding system (PBS) to create

11   pilots' schedules.[1] ECF No. 21-10 at 12-13.  Under the PBS, pilots indicate their preferences for

12   certain activities, such as specific flights, days off, start times, or end times. *Id.* at 14-15.  An

13   algorithm then creates the pilots' schedules based on the pilots' indicated preferences, while also

14   abiding by constraints created by regulatory and CBA requirements. *Id.* at 15-18.  The PBS also

15   solves for "must work days" (MWD).  A MWD is a day in which the number of assignments

16   which must be filled is greater than or equal to the number of pilots available to fill those

17   assignments. ECF No. 21-6 at 3.  Since adopting the PBS (and also following the CBA's

18   effective date), the PBS solves for MWDs first. *Id.* at 4.  In other words, the PBS first identifies

19   the most senior pilot, meaning the pilot whose preferences have priority over other pilots'

20

21   [1] The parties previously litigated whether Allegiant's switch to the PBS during the parties' CBA
     negotiations violated its status quo obligations, as well as whether the Union's threatened strike
22   over Allegiant's subsequent modifications to PBS violated the Railway Labor Act (RLA). *See
     Int'l Bhd. Of Teamsters, Airline Div. v. Allegiant Air, LLC*, No. 2:14–cv–00043–APG–GWF,
23   2014 WL 3653455 (D. Nev. July 22, 2014), *rev'd* 788 F.3d 1080 (9th Cir. 2015); *Allegiant Air,
     LLC, v. Int'l Bhd. Of Teamsters*, No. 2:15–cv–00580–APG–GWF, 2015 WL 1994779 (D. Nev.
     May 1, 2015).

preferences, then identifies any MWDs, and awards that pilot's highest work preferences for the

MWD before completing the rest of that pilot's schedule. *Id.* at 15.  The PBS then identifies the

next most senior pilot, awards that pilot their highest work preference on any MWD, and then

completes the rest of that pilot's schedule, and so on.[2] *Id.*

Allegiant and the Union[3] are parties to a CBA governing the pilots' employment. ECF

No. 21-3.  Negotiations over the parties' first CBA began in December 2012 and concluded in

June 2016. ECF No. 21-10 at 30.  The parties agreed on the CBA's language regarding

scheduling (*Id.* at 42), but they were unable to agree on certain specifics regarding the PBS.  So,

they agreed to negotiate a letter of agreement regarding PBS that would specify "software

requirements and timeframes for completion of all automation requirements and availability for

use" (PBS letter of agreement). ECF No. 21-3 at 95.  The parties agreed to negotiate the PBS

letter of agreement within 60 days of signing the CBA and to implement it within 180 days of the

signing of the CBA. *Id.*

The CBA became effective August 1, 2016. *Id.* at 2, 160.  Its relevant portions are:

- Section 1(J) is a management rights provision that reserves for Allegiant the rights to

  manage its business that Allegiant had prior to entering into the CBA. *Id.* at 12.

- Section 15 governs how Allegiant schedules pilots. *Id.* at 94-114.  The section provides

  that "[a] [m]onthly [b]id shall be conducted during each" calendar month, and that

  schedules will "be awarded to current and qualified [p]ilots in order of [s]eniority." *Id.* at

  95.  Pilots' preferences include, among other factors, schedules with a certain number of

---

[2] Prior to January 2017, Allegiant created schedules slightly differently, but has solved for MWDs first since adopting PBS. *Id.* at 4, 6-7.

[3] The Union is the successor union to Local 1224, which is the union listed on the CBA. ECF Nos. 1 at ¶ 5; 12 at ¶ 5.

days off, specific days off, and specific trip pairings. *Id.* at 100.  The pilots' initial schedule awards "shall be accomplished in [s]eniority order by awarding each eligible [p]ilot his . . . preferences in accordance with" the applicable timeline. *Id.* at 101.  Section 15(A)(9) also contains the parties' agreement to negotiate the PBS letter of agreement and the timeline for doing so. *Id.* at 95.  It states that the "agreed upon timeline" for negotiating the letter of agreement "shall be extended if completion of automation is beyond [Allegiant]'s control." *Id.*

- Section 18 governs the parties' grievances procedures. *Id.* at 124-34.  Section 18(B) and (C) provide the timeline for grievances and state that prior to filing a grievance, the affected pilot or their Union representative must discuss the dispute with "the System Chief Pilot" within 30 days after the pilot or Union becomes aware of the dispute. *Id.* at 126.  The System Chief Pilot must then respond with a decision within 15 days after the discussion. *Id.*  Finally, if the pilot or Union disagrees with the decision, they may file a grievance within 15 days of receiving the decision. *Id.* at 126-27.  Section 18(E) provides that "[t]he time limits contained in . . . Section 18 may be extended by written agreement between the parties" and "all confirmations of mutual extensions of time limits shall be in writing and accomplished as provided in . . . Section 18." *Id.* at 129.

- Section 19 establishes an SBA to decide disputes arising under the CBA, pursuant to the Railway Labor Act (RLA). *Id.* at 130.  Section 19(A)(2) states that while the SBA has the jurisdiction to decide disputes arising under the CBA, its jurisdiction does not "extend to proposed changes in . . . working conditions and shall have no authority to modify, amend, revise, add to or subtract from any of the terms or conditions of" the CBA. *Id.* Further, while the SBA considers the appeal of any grievance properly submitted to it, the

SBA does "not have jurisdiction to consider any dispute in which the applicable

provisions of Section 18 have not been complied with, except as provided elsewhere in

[the CBA], or which has not been submitted to the [SBA] in a timely manner; provided,

all procedural disputes shall be resolved by the" SBA. *Id.* (emphasis omitted).

On November 14, 2016, Allegiant notified the Union by email that to comply with certain

scheduling provisions of the CBA, Allegiant would

> complete a senior [p]ilot's schedule prior to placing any [t]rip [p]airings on any junior
> [p]ilot's schedule.  Should [i]t be necessary for a [p]ilot to be awarded an assignment on a
> particular day(s), it will be done in order of his [p]references for said day(s) prior to any
> assignments being awarded for other days and prior to awarding any assignment to a
> junior [p]ilot.

ECF No. 21-9 at 3-4.  The Union responded the same day, stating that Allegiant's explanation

did not comply with the CBA because bids are meant "to be awarded on a monthly, not daily

basis.  By assigning [schedules] on a 'particular day' [Allegiant is] violating a pilot's

preferences. . . .  Awarding pilot preferences out of sequential order, is to ignore the [p]ilot's

preferences." *Id.* at 3.  Allegiant replied two days later that its process complied with the CBA.

*Id.* at 2-3.

On March 2, 2018, the Union filed grievances alleging that Allegiant violated the CBA in

creating a pilot's schedule by solving for MWDs first. ECF No. 21-5 at 2-3.  The Union filed

more than 200 grievances alleging violations concerning the PBS and MWDs. ECF No. 21-1 at

¶ 4.  The parties' negotiations on the PBS letter of agreement ended in June 2018 without an

agreement. ECF No. 24-1 at 521.  In August 2018, the Union requested arbitration on 90

grievances it had filed related to the PBS. ECF No. 21-7 at 2-3.

The parties participated in an arbitration hearing before the SBA in July and September

2019. ECF No. 21-2 at 3.  Arbitrator Richard Bloch served as the chair of the SBA, which also

included a union-appointed member and a company-appointed member. *Id.* at 32.  The Union's single proposed issue was whether Allegiant violated the CBA's scheduling provisions by not awarding schedules in accordance with pilots' seniority and preferences. *Id.* at 3.  As relevant here, Allegiant's proposed issues were (1) whether its manner of solving for pilots' "schedules in the bid award process for" MWDs violated the CBA, and (2) whether the Union's grievances were untimely. *Id.* at 4.

As summarized by the SBA, the Union's position was that Allegiant's solving for MWDs first necessarily deprived pilots of their preferred schedule that their seniority would otherwise guarantee. *Id.* at 4.  Allegiant, on the other hand, maintained the position that "its intent to create . . . schedules by solving [MWDs] first was fully understood by the bargaining parties during" CBA negotiations. *Id*. at 4-5.  Allegiant believed that "awarding the most senior [p]ilot [their] highest work preference on an MWD" recognizes seniority. *Id.* at 5.  Further, Allegiant maintained that the grievances were untimely because the Union was aware that Allegiant intended to continue solving for MWDs first under the CBA as early as November 2016, at which time the Union protested that this practice violated the CBA, but the Union did not file grievances until March 2018, beyond the deadline for filing grievances. *Id.*

The SBA issued its Award in June 2020, finding that Allegiant's practice violated the CBA. *Id.*  Specifically, the SBA found that "[s]eniority must be observed in solving for [MWDs].  In that process, expressed bid preferences must be awarded, seniority permitting, in sequential order.  [Allegiant] is ordered to cease and desist from practices that interfere with those requirements." *Id.*  The company-appointed member dissented from the Award. *Id.* at 32-26.

With regard to the timeliness issue, the SBA found that while it was not unreasonable for Allegiant to identify the November 2016 email exchange as the moment the Union was aware of the dispute, and that absent more, the grievances would be untimely, the CBA's grievance time limits were not in force at the time. *Id.* at 8-9.  The SBA found that the parties, "by their conduct and by their written agreements, intended to waive applicable time limits for filing a grievance on the subject of PBS during the time both parties were reviewing options in the search for modification or replacement of the existing system." *Id.* at 9.  The SBA cited Section 15(A)(9), which established the PBS letter of agreement negotiation and implementation timeline, for its conclusion that "[t]hese terms speak loudly and comprehensively . . . to the parties' commitment to work together aggressively to seek a solution they could both live with." *Id.* at 10.  The SBA found significance in the CBA's agreement to extend the negotiation timelines if "completion of automation is beyond [Allegiant]'s control" and the letter of agreement's terms, which were recorded in the CBA. *Id.* at 10-11.  The SBA interpreted the letter's language as "manifest[ing] unequivocal recognition by both parties that . . . a . . . mutually acceptable PBS program was very much a work in progress" and, "taken together with the terms of section 15(A)(9), as codifying the shared understanding that the cooperative search for a satisfactory bid system was to be the method for resolving their profound differences over PBS." *Id.* at 12.  The SBA found that the parties would not have created and extended the 180-day negotiation timeline while simultaneously "anticipating a 30-day limit for protesting" the PBS's continued existence, and concluded the grievances were timely. *Id.*  It stated that its "reading of the [letter of] agreement is that, by their actions, the parties signaled a joint intention to suspend those time limits in favor of the limits constructed in Section 15.A.9 in anticipation of achieving a resolution." *Id.* at 12 n.12.

The SBA acknowledged that the Union had filed grievances by the time the PBS negotiations ended and that it filed additional claims afterwards. *Id.* at 12.

Regarding the merits of the MWD scheduling dispute, the SBA sided with the Union. *Id.* at 19.  It found that both parties assumed that pilots' preferences would be awarded in "sequential" order prior to the onset of the PBS and that this was "the process that has been continued, following the adoption of PBS in all cases *except* those where" MWDs are solved for first. *Id.*  Against this background, solving for MWDs first was "a major exception to an understood (industry-wide, as well as at Allegiant) practice recognizing the important wage and quality of life implications of molding schedules to suit one's preferences." *Id.*  The SBA reasoned that such a major exception would have been "writ large in the [CBA]." *Id.*  Allowing Allegiant to pick and choose from among the pilots' selections, which are listed in order of most to least desired, was contrary to the "unqualified language of Section 15." *Id.*  The SBA concluded that though the CBA does not explicitly reference sequential bids,

> the very nature of the ability to mold lifestyle and work choices, subject to and protected by one's seniority, would be meaningfully compromised if management could, at its option, re-arrange the sequence of desired preferences - a substantial exception to a guarantee that is not only unqualified by the labor agreement but which, as noted above, in practice is honored in every assignment *except* those involving MWDs.

*Id.* at 19-20.  The SBA finally concluded that the parties' negotiations did not reflect an agreement to utilize MWDs when creating pilots' schedules. *Id.* at 20.  The SBA relied on "[t]he existence of the tumultuous arguments surrounding the issue and the fact that the Union itself supplied the language that ultimately appeared in the [CBA]." *Id.* at 24.

The parties dispute whether Allegiant has complied with the Award. *Compare* ECF No. 21-1 at ¶ 13 ("After Arbitrator Bloch issued his award, Allegiant changed its scheduling system to comply with his order that it stop solving [MWDs] first.") *with id.* ("The Union, however,

almost immediately began alleging that Allegiant was failing to comply with his order.") *and* ECF No. 21-12 (pilot grievance alleging that pilot's having MWDs on their schedule violates the CBA and the Award).  The Union has filed at least one "pre-grievance" alleging Allegiant is violating the Award and the CBA by continuing to schedule pilots on MWDs. ECF No. 21-12 at 2-3.

## II. ALLEGIANT'S MOTION FOR SUMMARY JUDGMENT TO VACATE AWARD

Allegiant argues I have jurisdiction to set aside the Award because the SBA did not confine itself to matters within its jurisdiction.  Allegiant contends that federal courts must vacate awards that ignore terms of a collective bargaining agreement, are contrary to an agreement's clear language, add or subtract terms from an agreement, or rely on an arbitrator's own notions of fairness.  Allegiant argues I should vacate the Award because (1) it is contrary to the CBA's clear language concerning the grievance timeline; (2) the SBA deprived Allegiant of its right to due process by holding the Union's claims were timely based on a theory the Union did not advance and of which Allegiant had no notice; and (3) the SBA exceeded its jurisdiction by ignoring the undisputed evidence and CBA language and instead applying its own sense of industrial justice.

The Union responds that courts generally reject claims challenging SBA decisions for lack of jurisdiction and that I should do so as well.  The Union argues that Congress intended disputes over the interpretation of collective bargaining agreements to be resolved through arbitration rather than by courts, and that this deference applies to cases under the RLA.  It notes that my review of the Award is narrow and that if the SBA even arguably construed or applied the CBA, it acted within its jurisdiction.

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

Under the RLA, the scope of a court's review of an SBA award is "among the narrowest known to the law." *Int'l Ass'n of Machinists and Aerospace Workers, Dist. Lodge #19 v. S. Pac. Transp. Co.*, 626 F.2d 715, 717 (9th Cir. 1980).  Review is "limited to three specific grounds: (1) failure of the [SBA] to comply with the requirements of the [RLA]; (2) failure of the [SBA] to conform, or confine, itself to matters within the scope of its jurisdiction; and (3) fraud or corruption." *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978) (per curiam) (citing 45 U.S.C. § 153 First (q)); *see also Singer v. Flying Tiger Line Inc.*, 652 F.2d 1349, 1355-56 (9th Cir. 1981) (abrogated on other grounds) (standard of review outlined in 42 U.S.C. § 153 applies to reviews of awards made by airline industry system boards).  Courts also have jurisdiction to review awards for constitutional due process challenges. *Edelman v. W. Airlines, Inc.*, 892 F.2d 839, 847 (9th Cir. 1989).

Courts do not retry SBA decisions on the merits. *Bernhardt v. Am. Airlines, Inc.*, 511 F.2d 1219, 1220 (9th Cir. 1975).  "The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Paperworks Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987) (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596 (1960)).  This is so in part because

1    arbitrators address disputes that require their "knowledge of the custom and practices of a

2    particular factory or of a particular industry." *Enter. Wheel & Car Corp.*, 363 U.S. 593 at 596.

3    "When an arbitrator is commissioned to interpret and apply the collective bargaining agreement,

4    he is to bring his informed judgment to bear in order to reach a fair solution of a problem." *Id.* at

5    597.

6    　　　　Consequently, courts do not consider claims that an arbitrator committed factual or legal

7    errors. *S. Cal. Gas Co. v. Util. Workers Union of Am., Local 132, AFL-CIO*, 265 F.3d 787, 792

8    (9th Cir. 2001). An arbitrators' interpretation of parties' agreements, and their factual findings,

9    are afforded a "nearly unparalleled degree of deference." *Sw. Reg'l Council of Carpenters v.*

10   *Drywall Dynamics, Inc.*, 823 F.3d 524, 530 (9th Cir. 2016). If an arbitrator even arguably

11   construes or applies the contract and acts within the scope of their authority, the court may not

12   overturn the decision, even if it is convinced the arbitrator committed serious error. *S. Cal. Gas*,

13   265 F.3d at 792. Similarly, review is limited to whether the arbitrator's decision "can be

14   rationally derived from some plausible theory of the general framework or intent of the

15   agreement." *United Food & Com. Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74

16   F.3d 169, 173 (9th Cir. 1995). The court may not supplement an arbitrator's factual findings

17   with its own. *Sw. Reg'l Council of Carpenters*, 823 F.3d at 530. In sum, the task is to "review

18   the procedural soundness of the arbitral decision, not its substantive merit." *Haw. Teamsters and*

19   *Allied Workers Union, Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1181 (9th Cir. 2001).

20   　　　　Still, "an arbitrator is confined to interpretation and application of the collective

21   bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of

22   course look for guidance from many sources, yet his award is legitimate only so long as it draws

23   its essence from the collective bargaining agreement." *United Steelworkers*, 363 U.S. at 597; *see*

1   *also S. Cal. Gas*, 265 F.3d at 792 (court may question arbitrator's judgment only where they

2   "ignore the contract's plain language, choosing instead to dispense [their] own brand of

3   industrial justice").  "When the arbitrator's words manifest an infidelity to this obligation, courts

4   have no choice but to refuse enforcement of the award." *United Steelworkers*, 363 U.S. at 597.

5   An award fails to draw its essence from the collective bargaining agreement when an arbitrator

6   "ignore[s] the plain language of the contract" and "instead follow[s] their own whims and

7   biases." *See Haw. Teamsters*, 241 F.3d at 1181.  An arbitrator also "has no authority to ignore

8   the plain language of a collective bargaining agreement that limits the scope of [their] authority."

9   *Id.*; *see also Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405-06 (5th

10  Cir. 2003) (court is "free to scrutinize an arbitrator's award to ensure that the arbitrator acted in

11  conformity with the jurisdictional prerequisites of the collective bargaining agreement.")

12  (quotation omitted).

13      1.  Timeliness Decision

14          Allegiant's first argument relates to the SBA's finding that the Union's grievances were

15  timely.  Allegiant argues the SBA failed to apply the CBA's deadlines, and therefore exceeded

16  the SBA's jurisdiction.  Allegiant relies on CBA Sections 15, 18, and 19, which concern the

17  grievance timeline.  It argues the SBA's holding that the parties' conduct or desires modified the

18  timeline does not cite any written agreement to extend those deadlines and is contrary to the

19  express requirements that any timeline changes be in writing.  It contends that by expressly

20  providing the exclusive process for extending the timeline, the CBA precludes any other options.

21  Allegiant notes that neither the SBA nor the Union suggested a written agreement modified the

22  timeline; rather, the basis for its holding was the parties' desire to reach agreement on a new PBS

23  and their implicit modification of the timeline.  Allegiant argues the SBA exceeded its

1   jurisdiction by ignoring express CBA provisions to impose additional contractual requirements

2   because neither Section 15 nor the letter of agreement waive or extend the timelines on their

3   face, particularly when compared to other provisions where the parties agreed to modify the

4   CBA's grievance procedures.  Allegiant thus contends that when the parties wanted to waive the

5   timeline they knew how to do so, but they did not do so here.

6        The Union responds that the SBA knew Allegiant asserted the grievances were untimely,

7   and the parties were given the opportunity to present evidence on this issue.  The Union contends

8   I may not open the record that was before the SBA and make my own interpretation, and the

9   arbitration awards cited by Allegiant have no impact on my limited review in this case.  It argues

10  the SBA reviewed and interpreted the CBA and the evidence, made its determination based on its

11  review, and there is no factual or legal basis for me to determine the SBA exceeded its

12  jurisdiction.[4]

13       Allegiant argues that courts should apply particular scrutiny to rulings concerning

14  arbitrability and jurisdiction, to ensure arbitrators have not exceeded limitations imposed by

15  agreements.  In reply to the Union's argument that it did not challenge Allegiant's scheduling

16  MWDs first because the parties were negotiating a PBS letter of agreement, Allegiant contends

17  that the Union expressly challenged this practice and filed grievances over it prior to the end of

18  the negotiations.

19

20

---

21  [4] Elsewhere in its response, the Union argues that because of the PBS letter of agreement
    timeline language in the CBA, it did not file any grievances on the MWD issue.  However, the
22  record citations it provides do not support this proposition. *See* ECF No. 24-1 at 230-32; 234-37;
    296-99; 517-42.  It also argues that it presented evidence on the parties' CBA, the PBS letter of
23  agreement and negotiations, and its March 2018 grievances.  Again, the record citations the
    Union provides are either not before me or do not support this proposition. *See* ECF No. 24-1 at
    292-93 (transcript does not include page 489, as the Union cites); 517-528.

1    Allegiant's argument is based on the premise that the SBA exceeded its jurisdiction

2 because the grievances were untimely.  Allegiant contends the SBA ignored the CBA's

3 requirement that timeline modifications must be in writing.  However, the SBA found that the

4 parties intended to waive the grievance timeline provisions "by their conduct and by their written

5 agreements." ECF No. 21-2 at 9.  The Award cites Section 15(A)(9) (which creates the timeline

6 for the parties to negotiate the PBS letter of agreement and states this timeline "shall be extended

7 if completion of automation is beyond [Allegiant]'s control") and the letter of agreement as

8 written evidence of the parties' intent to waive the grievance timeline. ECF No. 21-2 at 9-12.

9 The SBA concluded that these two writings codified the parties' understanding that they would

10 resolve the PBS issue cooperatively, and they would not have created a timeline for doing so

11 while also anticipating the grievance timeline would apply to grievances over the then-existing

12 PBS. *Id.* at 12.  The SBA stated it interpreted the letter of agreement as the parties' joint

13 intention to suspend the grievance time limits in favor of Section 15(A)(9)'s time limits. *Id.* at 12

14 n.12.

15    The SBA did not ignore the CBA's limitations on its jurisdiction—namely that it has

16 jurisdiction to hear only timely claims and those which comply with Section 18[5] or that

17 agreements to extend the Section 18 timelines must be in writing[6]—when it found that the

18 parties intended to waive the grievance timeline.  Rather, it found that, consistent with

19 Section18(E)'s writing requirement, Section 15(A)(9) and the letter of agreement evinced the

20 parties' intent to waive the grievance timeline.  The SBA applied and construed the CBA's

21

22

23 [5] ECF No. 21-3 at 130, Section 19(A)(3).

[6] Id. at 129, Section 18(E).

relevant provisions in finding that the parties agreed to extend the timeline and that the grievances were timely.  Therefore, the SBA acted within its jurisdiction in issuing its Award.

The SBA considered the fact that the Union had filed grievances by the time the parties' PBS negotiations ended, and that it filed additional grievances afterwards, and still concluded the grievances were timely.  I defer to the SBA's finding on the merits that the grievances were timely because it is based on an arguable construction of the CBA's Sections 15(A)(9), 18(B), 18(C), 18(E), 19(A)(2) and 19(A)(3).  I do not substitute my own finding regarding whether the parties could or should have more clearly agreed to extend the timeline, because I defer to the SBA's arguable findings.

Allegiant argues that the present case resembles the awards at issue in three out-of-circuit cases: *Marshall Durbin Poultry Co. v. United Food and Commercial Workers Union, Local 1991*, 117 F. Supp. 2d 566 (S.D. Miss. 2000), *aff'd*, 268 F. 3d 1064 (5th Cir. 2000); *Southwest Airlines Co. v. Local 555, Transport Workers Union of America AFL-CIO*, 912 F.3d 838 (5th Cir. 2019); and *American Eagle Airlines, Inc. v. Air Line Pilots Association International*, 197 F. Supp. 2d 580 (N.D. Tex. 2002), *aff'd*, 343 F.3d 401 (5th Cir. 2003).  In *Marshall Durbin*, an employer appealed two arbitration awards, arguing that the underlying cases were not arbitrable because the Union did not follow the parties' collective bargaining agreement's grievance procedure and the arbitrators exceeded their jurisdiction by finding otherwise. *Id.* at 569-70.  The court agreed, reasoning that the CBA's express language required certain steps be complied with, and the arbitrators' ruling that the CBA did not so require must be vacated. *Id.* at 570-71.  The court also noted that one of the arbitrators erred by basing their finding on the fact that one of the procedural steps was often handled informally by the parties, because the agreement required that a waiver of this step must be in writing, and there was no such writing. *Id.* at 571.  But

unlike the arbitrators in *Marshall Durbin* who ignored the agreements' language with regard to modifying the grievance timeline, the SBA here found the parties intended to modify the grievance timeline through their writings, as the CBA contemplates, in addition to through the parties' intent. ECF No. 21-2 at 9 ("the parties, by their conduct and by their written agreements, intended to waive applicable time limits for filing a grievance . . .").

In *Southwest,* the Fifth Circuit found the arbitration award conflicted with the agreement's plain language because it did not account for certain language regarding the agreement's ratification date or the parties' conduct and instead relied on the execution page of the agreement, which the court found was not one of the agreement's terms. 912 F.3d at 846. Unlike the award at issue in *Southwest*, here the SBA relied on the parties' writings to find they intended to modify the grievance timeline.  Thus, unlike the award in *Southwest*, the SBA arguably construed the CBA to find the grievances were timely.

In *American Eagle*, the court found that the system board of adjustment exceeded its jurisdiction because its award imposed an additional requirement on the parties. *Id.* at 585-86. The board found the airline had just cause to terminate a pilot, but that the pilot should nonetheless be reinstated to remedy the fact that he was denied a first step hearing. *Id.* at 584. The court vacated the award, finding that the agreement allowed the first step hearing to be waived under the circumstances and the award thus imposed an additional requirement not found in the parties' agreement when it required more than just cause to terminate the pilot. *Id* at 585. Unlike the award in *American Eagle*, the Award here does not impose additional requirements on the parties: Section 18(E) requires written agreement to modify the grievance timelines, and the SBA found that Section 15.A.9 and the letter of agreement were written agreements evidencing the parties' intent to modify the timelines.  The SBA therefore found the parties

1   agreed in other portions of the CBA to modify the timeline.  Indeed, Allegiant notes that still

2   other portions of the CBA amount to written agreements to extend the grievance timelines. ECF

3   No. 21-3 at 140 (Section 22(A)(6)).

4        2.  Due Process

5        Allegiant argues I should vacate the Award because the SBA deprived Allegiant of due

6   process.  Specifically, it contends that Allegiant did not have an opportunity to present evidence

7   and argument as to whether the CBA allowed the grievance timelines to be modified by

8   implication, and whether there was such an implicit modification in this case.  Allegiant argues

9   that the Union did not present evidence or argument contesting the untimeliness of its claims,

10  asserting that Allegiant had agreed to modify the timeline, or suggesting that the parties' actions

11  could indicate such an agreement.  Allegiant argues the Award's finding that the parties had

12  implicitly intended to ignore the timelines while they negotiated the PBS letter of agreement

13  deprived Allegiant of the opportunity to present evidence on this issue, including the CBA's

14  requirement that such an extension be made in writing.  Allegiant contends that if it had been

15  afforded the opportunity to address these issues at the hearing, it would have pointed out that this

16  argument is contrary to the CBA's language and the facts.

17       The Union responds that courts have held that failure to raise a due process objection

18  before the SBA precludes a party from revisiting it later in court.  It contends that Allegiant did

19  not assert a due process argument before the SBA and could have presented evidence on the

20  issues at arbitration and in its post-hearing brief but did not do so.[7]

21

22  _____

23  [7] In its reply to its motion to enforce, the Union again responds to Allegiant's due process
    arguments.  It argues that the record before the SBA was complete and included references to the
    parties' negotiations over the PBS letter of agreement and the Union filing grievances once those
    negotiations ended.  It again contends Allegiant had the opportunity to address that evidence in

1    Allegiant replies that the Union conceded that the question of whether the parties

2   implicitly extended the grievance timeline did not arise at the arbitration hearing by not disputing

3   it.  Allegiant argues that there was no way for it to raise its due process argument during the

4   hearing, and arbitration decisions must be based on the evidence and arguments presented during

5   the parties' proceedings.  Allegiant argues that the Union did not present evidence concerning

6   the timeliness of the grievances and the provided record citations do not support the Union's

7   contention.  Finally, Allegiant argues the Union does not claim it or the SBA raised the notion of

8   implicit waiver of the CBA's deadlines, meaning it is undisputed that Allegiant did not receive

9   warning that the SBA intended to rule on that basis; thus, Allegiant could not have raised its due

10   process claim at the hearing.

11    "Under the RLA provisions governing Board hearings, due process requires that: (1) the

12   Board be presented with a 'full statement of the facts and all supporting data bearing upon the

13   disputes,' . . . and (2) the '[p]arties may be heard either in person, by counsel, or by other

14   representatives . . . and the . . . Board shall give due notice of all hearings to the employee.'"

15   *English v. Burlington N. R.R. Co.*, 18 F.3d 741, 744 (9th Cir. 1994) (citing 45 U.S.C. § 153 First

16   (i), (j)).  In the RLA context as well, "'[d]ue process is flexible and calls for such procedural

17   protections as the particular situation demands.'" *Edelman v. W. Airlines, Inc.*, 892 F.2d 839, 847

18   (1989) (citation omitted).

19    Due to the nature of Allegiant's due process claim, it could not have raised this issue

20   prior to the Award.  However, Allegiant does not show that it was deprived of the process that is

21   due under the RLA.  Allegiant does not argue that the SBA's factual record was incomplete, that

22

23   its post-arbitration briefs.  It finally argues Allegiant should not be allowed to raise new
     arguments.

it was not heard at the arbitration, or that employees did not have notice of hearings. *See English*, 18 F. 3d 741 at 744 (stating what due process the RLA requires for parties during hearings). Allegiant cites no authority for its argument that it is entitled to the precise process it now demands under the RLA.  Allegiant raised the timeliness issue before the SBA.  It does not contend that the SBA prevented it from presenting arguments under Section 18(E) or otherwise that the grievance timeline was not modified.  *See Chicago, R.I. & P.R. Co. v. Wells*, 498 F.2d 913 (7th Cir. 1974) (board denied plaintiff due process when it denied a request for an extension due to untimeliness, after applying rule for determining the timeliness of an extension request which was not in place at the time, not made public, and not uniformly applied, foreclosed the plaintiff from appearing before board).  Such arguments were reasonably foreseeable as being within the scope of Allegiant's own timeliness argument.  Keeping in mind that due process requires the procedural protections that the particular situation demands, Allegiant has not shown that it was deprived of any due process that it was entitled to in these circumstances.

But even if Allegiant had raised its current timeliness arguments, or the additional argument it contends it would have in response to the SBA's timeliness finding, before the SBA, it does not appear that the SBA's decision on timeliness would have been different.  Allegiant argues that, had it been able to address these issues at the hearing, it would have noted that the SBA's theory violated the CBA's plain language and was contradicted by facts, such as that the Union filed grievances several months before the parties' PBS negotiations ended.  But as explained above, the SBA's finding on timeliness did not violate the CBA's plain language.  And the SBA considered the facts that Allegiant states it would have presented. *See* ECF No. 21-2 at 12 ("[N]egotiations over the new system ceased in June or July 2018, by which time grievances were filed.  Additional claims were submitted thereafter.").

3.  <u>Ignoring Evidence and Applying Own Industrial Justice</u>

Allegiant argues I should vacate the Award on the merits because the SBA ignored unrebutted evidence and applied its own sense of industrial justice in concluding that Allegiant agreed to give up its right to solve MWDs first.  Allegiant contends that the evidence established that during negotiations, the Union did not suggest that the CBA would require Allegiant to change its practice of solving for MWDs first, and that Allegiant's clear understanding was that the CBA would continue to allow this practice.  Allegiant contends the parties' prior litigation also proved this point.  Allegiant argues that the Union's failure to challenge Allegiant's testimony regarding the parties' intent should have compelled the SBA to deny the Union's claim.  Allegiant contends the SBA exceeded its jurisdiction to interpret the CBA because the Award is based on the SBA's own assumptions about what would be most fair for the pilots. Further, it argues that because (1) it could solve for MWDs first prior to the CBA, (2) creating schedules relates to Allegiant managing its business, and (3) the CBA did not expressly provide that Allegiant agreed to surrender this ability, the management rights clause prohibited any limitation of Allegiant's right to continue this practice.

By way of factual background, the Union argues that the parties agreed to clear, specific language regarding Allegiant's obligation to award monthly schedules in order of seniority through pilots' preferences.  The Union also contends that Allegiant knew the Union believed Allegiant's method of solving for MWDs was not the correct way to create schedules because it violated the seniority requirements, and that the Union was opposed to using MWDs to create schedules.  The Union emphasizes certain portions of the CBA, including Section 15's requirement that schedules ". . . be awarded to . . . [p]ilots in order of [s]eniority."  The Union notes that during the hearing, Allegiant acknowledged that following CBA negotiations, it could

1  continue solving for MWDs first while the parties negotiated the PBS letter of agreement. ECF

2  No. 24-1 at 284-85.

3        The SBA's Award is based on an arguable construction of the CBA.  The SBA reasoned

4  that while Section 15 does not explicitly refer to pilots' preferences being awarded sequentially,

5  both parties assumed this was the practice in all relevant cases except for those where MWD's

6  are solved for first. ECF No. 21-2 at 19.  The SBA reasoned that such a major exception to the

7  industry-wide and Allegiant-wide practice that recognized the wage and quality of life

8  implications of scheduling pilots according to their preferences would have been "writ large" in

9  the CBA. *Id.*  It reasoned that assigning the pilots' preferences in any order other than from their

10  most to least desired would be contrary to Section 15's scheduling provisions. *Id.*  The SBA

11  recognized that the CBA did not reference assigning schedules based on the sequence of pilot

12  preferences, but it found that pilots would not be able to realize the benefits of their seniority if

13  Allegiant could rearrange the sequence of the pilots' preferences. *Id.* at 20.  The SBA found that

14  Allegiant's reading was not supported by the CBA and would be an exception to how Allegiant

15  scheduled pilots in every situation other than those involving MWDs. *Id.*

16        The SBA also found that the parties' bargaining history reflected Allegiant's continued

17  demand that MWDs be a part of the CBA's scheduling process, but that the Union did not

18  acquiesce on this point. *Id.* at 20-24.  It reasoned that the letter of agreement does not endorse

19  solving for MWDs first but recognized its use while the parties searched for a replacement

20  scheduling process. *Id.* at 26.  The letter of agreement did not modify Allegiant's obligation,

21  found in Section 15(I), to schedule based on seniority, nor did it deprive the Union of the

22  opportunity to grieve Allegiant's application of the scheduling language. *Id.*  In sum, the SBA's

23  finding was based on (1) the CBA's requirement that pilots' schedules be awarded in seniority

order, (2) its finding that an exception to the practice of awarding pilots' preferences sequentially would have been written clearly and obviously in the CBA, and (3) its reasoning that such an exception was not "writ large" in the CBA.

Additionally, the SBA was entitled to conclude that scheduling MWDs first would be an exception to industry- and Allegiant-wide practices and that such an exception would be "writ large." *Id.* at 19; *see Enter. Wheel & Car Corp.*, 363 U.S. at 596-97 (Arbitrators must "bring [their] informed judgment to bear in order to reach a fair solution of a problem. . . . [They] may of course look for guidance from many sources, yet [their] award is legitimate only so long as it draws its essence from the collective bargaining agreement."); *see also Rossi v. Trans World Airlines, Inc.*, 507 F.2d 404, 405 (9th Cir. 1974) (finding industry-drawn arbitration board better suited to determine pilot's discharge was justified than court, and finding no indication the board "ignored the terms of the collective bargaining agreement- as derived both from its express provisions and from the customary practices of the industry- and dispensed its 'own brand of industrial justice.'"). The SBA considered the practices of the industry and at Allegiant while arguably construing the CBA in issuing its Award.

Allegiant also argues that the SBA's decision was incorrect on the merits because of the management rights provision. But because the Award draws its essence from the CBA, I do not consider Allegiant's argument that the SBA committed a legal error by not finding that a different CBA provision should apply.[8]

**III. ALLEGIANT'S MOTION TO DISMISS THE UNION'S COUNTERCLAIM AND THE UNION'S MOTION TO ENFORCE ARBITRATION AWARD**

---

[8] The parties did not reference the management rights provision in transcript of the arbitration proceeding provided to me. To that end, Allegiant's argument in other portions of its motion that the SBA may base a decision on only the parties' arguments is at odds with its argument here.

1    Allegiant argues that I should dismiss the Union's counterclaim under Federal Rule of

2 Civil Procedure 12(b)(1).  Allegiant contends the Union's counterclaim is a minor dispute, over

3 which I lack subject-matter jurisdiction, because the counterclaim seeks to have me declare that

4 Allegiant's post-Award actions violate the Award.  Allegiant further argues that I lack

5 jurisdiction because the Union has already presented the same dispute through the grievance

6 process.  Allegiant contends the counterclaim does not explain how the Union believes Allegiant

7 is failing to comply with the Award or what the Union believes I should order to bring Allegiant

8 into compliance.  Further, Allegiant argues I should dismiss the Union's counterclaim under

9 Federal Rule of Civil Procedure 12(b)(6) because it has failed to allege facts sufficient to state a

10 claim.

11    The Union responds that its counterclaim seeks to have me enforce the Award and that,

12 under the RLA, an SBA's findings and order are subject to enforcement by a court.  The Union

13 contends that the Award is based on the SBA's review and interpretation of the evidence and

14 CBA, and I am not empowered to substitute my own interpretation of the record and the CBA for

15 the SBA's.

16    "In this action, as in all actions before a federal court, the necessary and constitutional

17 predicate for any decision is a determination that the court has jurisdiction- that is the power- to

18 adjudicate the dispute." *Toumajian v. Frailey*, 135 F.3d 648, 652 (9th Cir.1998).  Dismissal

19 under Federal Rule of Civil Procedure 12(b)(1) is appropriate if the complaint, considered in its

20 entirety, fails to allege facts on its face that are sufficient to establish subject matter jurisdiction.

21 *In re Dynamic Random Access Memory (DRAM) Antitrust Lit.*, 546 F.3d 981, 984-85 (9th Cir.

22 2008).

23

Courts characterize disputes that arise between parties to a collective bargaining agreement as either "major" or "minor," depending on whether the dispute is over a grievance or over the making of collective agreements. *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 722-24 (1945), *adhered to on reh'g*, 327 U.S. 661 (1946). "Major disputes generally result from attempts by labor or management to impose new obligations or create new rights. . . [and] must be settled through an extended bargaining process. . . . Minor disputes, on the other hand, generally result from attempts to enforce existing contractual obligations and rights. . . . Such disputes are subject to exclusive binding arbitration . . . ." *Ass'n of Flight Attendants v. Mesa Air Group, Inc.*, 567 F.3d 1043, 1047 (9th Cir. 2009). If an arbitrator even arguably construes or applies a collective bargaining agreement, then the reviewing court must affirm the arbitrator's award. *Haw. Teamsters and Allied Workers Union, Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1178 (9th Cir. 2001).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief can be granted. A properly pleaded complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

I apply a two-step approach when considering a motion to dismiss a counterclaim. *Id.* at 679. First, I accept as true all well-pleaded factual allegations and draw all reasonable inferences from the counterclaim in the defendant's favor. *Id.*; *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247-48 (9th Cir. 2013). Second, I consider whether the factual allegations in the counterclaim

allege a plausible claim for relief. *Iqbal*, 556 U.S. 662 at 679.  A claim is facially plausible when it alleges facts that allow the court to draw a reasonable inference that the other party is liable for the alleged misconduct. *Id.* at 663.  Where the counterclaim does not permit the court to infer more than the mere possibility of misconduct, it has "alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (simplified).  When the claims have not crossed the line from conceivable to plausible, the counterclaim must be dismissed. *Twombly*, 550 U.S. at 570.

As explained above, the SBA arguably construed the CBA in granting the Award. Therefore, I must enforce the Award.  But this does not, and I will not, address the minor issue of whether Allegiant violated or is currently violating the Award. *See Ciarleglio v. Metro-N. R.R. Co.*, 2008 WL 160957 at *3 (D. Conn. Jan. 15, 2008) (whether post-award conduct constitutes a violation of an arbitration award is considered a "minor" dispute).  During the February 24, 2022 hearing on this matter, the Union agreed that I need not rule on that issue to enforce the Award.

The Union's counterclaim sufficiently states a claim upon which relief can be granted. The Union's counterclaim to enforce the Award is plausible because it alleges that the CBA provided for the SBA to arbitrate disputes regarding interpretation of the CBA, and the SBA issued its Award sustaining the Union's grievances.  I deny Allegiant's motion to dismiss the Union's counterclaim for failure to state a claim.

**IV. CONCLUSION**

I THEREFORE ORDER that plaintiff Allegiant Air, LLC's motion for summary judgment **(ECF No. 21)** and motion to dismiss **(ECF No. 22) are DENIED.**

I FURTHER ORDER that defendants/counterclaimants International Brotherhood of Teamsters, Airline Division, and Airline Professionals Association Teamsters Local Union No. 2118's motion to enforce the arbitration award **(ECF No. 25) is GRANTED.**  I order Allegiant

Air, LLC to comply with the Award at issue in this case.  My order does not opine on whether

Allegiant is currently violating, or ever violated, that Award.

DATED this 10th day of March, 2022.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE